UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DynCorp International LLC,

        Plaintiff,

v.

AAR Airlift Group, Inc.,

        Defendant.

Case No. 6:15-cv-1454-ORL-3PGJK

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL
## (INJUNCTIVE RELIEF SOUGHT)

Plaintiff DynCorp International LLC ("DI"), by and through its undersigned counsel, brings this action against Defendant AAR Airlift Group, Inc. ("AAR"), seeking both preliminary and permanent injunctive relief, and compensatory, punitive and other damages resulting from AAR's tortious and unlawful conduct alleged herein.

### THE PARTIES

1.      DI is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Virginia and its principal office at 1700 Old Meadow Road, McLean, VA 22102.

2.      AAR is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in the State of Florida and its principal office at 2301 Commerce Park Drive, NE, Palm Bay, Florida 32905-2611.

1

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy in this case exceeds the sum of $75,000, exclusive of interest and costs, and the parties are of diverse citizenship.

4.     This Court has personal jurisdiction over Defendant and venue is proper in the District and Division in which this Court sits because at all times material hereto: (a) Defendant was and is a corporation organized under the laws of the State of Florida, with its principal place of business in this District and Division; (b) Defendant was and is maintaining an office for transaction of its customary business in this District and Division; and (c) a substantial portion of the events giving rise to the claims in this action occurred within the jurisdictional boundaries of this District and Division.

## SUMMARY

This case involves corporate espionage and the misappropriation of proprietary DI information, including DI trade secrets, by AAR and former DI employees that AAR hired and from whom AAR obtained confidential DI information. The misappropriation materially impaired DI's ability to fairly compete for a U.S. government contract worth billions of dollars and caused severe economic and non-economic damage to DI. AAR has admitted to the U.S. government that it has confidential and proprietary DI information in its possession but has neither returned that information to DI nor agreed to refrain from using that information. DI seeks through this suit to preliminarily and permanently enjoin AAR from making further use or disclosure of DI's confidential information, to disclose the extent of the misappropriation of DI confidential and proprietary information, to compel AAR to return all such information to DI, and to compensate DI for the harm it has suffered as a result of AAR's willful misconduct.

2

## FACTUAL ALLEGATIONS

### Background

5.      DI is a multi-billion dollar company that provides critical aircraft maintenance, logistics support, law enforcement and intelligence training, and base and contingency operations around the world on behalf of the U.S. government in furtherance of national security interests.   DI has a proven track record on many of the most challenging federal contracts, often in overseas and austere war zones in support of the U.S. warfighter.   DI routinely competes against other contractors, such as AAR, on many federal contracts.

6.      At present, DI and AAR are competing for the award of a federal government contract under Solicitation No. SAQMMA14R0319 ("Solicitation").   The Solicitation was issued on July 18, 2014, by the U.S. Department of State ("State" or "State Department") Bureau of International Narcotics and Law Enforcement Affairs, Office of Aviation ("INL/A") in support of State's Worldwide Aviation Support Services ("WASS") program.

7.      The competition under the Solicitation ("WASS Competition") is for the award of a multi-billion-dollar contract for the provision of aviation and related services in support of counter-narcotics operations and illicit drug eradication efforts in numerous countries around the world, including, among others, Afghanistan, Pakistan, Colombia, Iraq and Peru.

8.      The WASS program is a very complex and challenging contract, requiring significant management resources to support operations, maintenance and logistics on multiple continents, often in hostile and austere environments.

9.      The scope of the program requires vast expertise, experience and resources to provide safe and efficient aviation support, strengthen law enforcement, and support counter-narcotics and counterterrorism efforts.

10.     DI has been performing as the incumbent contractor on the WASS program through a predecessor contract ("Incumbent Contract") for over 23 years, providing excellent service, worth billions of dollars, to the State Department.

11.     Under the Incumbent Contract, DI provides a highly trained, courageous and professional team of more than one thousand five hundred personnel spanning eight countries, directly supporting the diplomatic and security interests of the United States and its allies around the world.

12.     On January 28, 2015, DI learned that – despite its excellent work on the Incumbent Contract – it was excluded from the WASS Competition by the State Department.

13.     DI believes that AAR remained as the only entity in the competition following DI's exclusion.

14.     DI filed a protest of its exclusion from the WASS Competition with the United States Government Accountability Office ("GAO") on February 12, 2015.

15.     In its protest, DI alleged, among other things, that the State Department materially misevaluated its proposal, and that, but for these errors, DI would not have been excluded from, and would have won, the WASS Competition.

16.     In response to DI's protest, on March 18, 2015, the State Department agreed and voluntarily decided to take corrective action, stating that it would re-evaluate the DI and AAR proposals and reconsider its competitive range determination.  That determination remains ongoing.

4

## AAR Misappropriated DI's Trade Secrets

17.     Following the State Department's decision to re-evaluate proposals, DI learned that AAR had misappropriated DI's trade secrets relating to the WASS program ("Trade Secrets") and used those Trade Secrets in connection with the preparation and submission of its proposal in the WASS Competition. The Trade Secrets obtained by AAR included confidential and proprietary DI financial and technical data relating to the Incumbent Contract, such as the salaries and pay differentials for personnel on the Incumbent Contract, other pricing and financial data about DI's performance on the Incumbent Contract, and technical data about DI's staffing approach and business operations. DI learned of AAR's misappropriation of DI Trade Secrets from a former AAR employee who reported AAR's misconduct, on an unsolicited basis, to DI on April 27, 2015, and provided additional details shortly thereafter.

18.     AAR's tortious misconduct included specifically targeting and hiring experienced DI employees and former employees who worked on DI's Incumbent Contract and had access to DI's Trade Secrets regarding that program – and who had contractual and fiduciary obligations to DI not to use or disclose DI Trade Secrets for any unauthorized purpose -- and pressuring, coercing, unlawfully inducing and otherwise causing these former DI employees to violate their confidentiality obligations to DI by providing AAR with the Trade Secrets.

19.     Like many government contracts of this magnitude and complexity, the WASS contract is to be solicited and awarded on a best value basis, such that the offeror with the most effective, innovative and efficient solution at the most competitive price will be selected to perform the work.

5

20.     For highly complex, coordinated, and multinational and multi-disciplinary operations, such as the WASS program, the successful contractor will need an initial understanding of the appropriate staffing mix, levels, and experience to meet and respond to the often rapid changes, escalation or de-escalation of mission parameters directed by the government, as well as where and how to recruit the right people with the right experience levels for the right positions.

21.     Through its performance of the Incumbent Contract, DI developed over its decades of experience the most efficient and effective combination of labor staffing, mix, qualifications, and cost structures and pricing to successfully meet and operate the program requirements. This data, all of which is embodied in the Trade Secrets, provide direct insight into DI's operations and pricing strategies and thus have very significant economic and non-economic value.

22.     The Trade Secrets are not generally known by those who can obtain economic value from their disclosure and are not readily ascertainable through proper means by those who can obtain value from them. DI takes efforts to maintain the secrecy of the Trade Secrets, including by not intentionally releasing the information to competitors or third parties (except to business partners who have a need for access to such information and who have executed agreements to maintain its confidentiality) and requiring its employees to sign agreements confirming their obligation to maintain the confidentiality of such information.

23.     DI is the sole owner of the Trade Secrets and was in possession of the Trade Secrets at all times material hereto, including at the time they were misappropriated by AAR.

24.     The Trade Secrets were wrongfully obtained, through an organized campaign, by several members of AAR's senior leadership, who intentionally targeted and hired DI employees with knowledge of the Trade Secrets in order to obtain DI confidential and proprietary information, including the DI Trade Secrets, from them.

25.     There were at least four former DI employees who were hired by AAR and from whom the Trade Secrets were solicited and/or obtained, all of whom had strict confidentiality obligations to DI to safeguard and not disclose any of the Trade Secrets or any other confidential and proprietary DI information.

26.     AAR senior leadership specifically asked these former DI employees to provide DI Trade Secrets, and in some cases, pressured the former DI employees to provide such information.

27.     The former DI employees whom AAR poached to seek and obtain Trade Secrets all have confidentiality and non-disclosure agreements with DI and also fiduciary obligations that survive their separation from DI, such that, at all times material hereto, they remain subject to those restrictions, prohibiting the disclosure of the Trade Secrets and other DI proprietary or confidential information, knowledge, and data.  These confidentiality and non-disclosure obligations prohibit the disclosure of the Trade Secrets wrongfully and tortiously sought and obtained by AAR from these former DI employees.

28.     AAR knew and/or had reason to know that the DI employees it approached and hired, and from whom it solicited the disclosure of DI Trade Secrets and other confidential DI information, had contractual and fiduciary obligations to DI that precluded them from making such unauthorized use or disclosure of DI information.

29.     The Trade Secrets misappropriated by AAR included but are not limited to Trade Secrets that were in written form and contained Trade Secrets with DI logos or legends on them. For example, on at least one occasion, members of AAR senior leadership were observed receiving and reviewing a large notebook of misappropriated DI Trade Secrets, which had DI logos or legends on them, from a former DI employee, who was obligated, under non-disclosure agreements, not to provide such information to any third party, and certainly not to a direct competitor such as AAR.

30.     AAR also misappropriated confidential and proprietary information, including DI Trade Secrets, through verbal communication with ex-DI employees through coercion and cooperation of the former DI employees.

31.     Moreover, at least one of the former DI employees obtained numerous documents containing DI Trade Secrets directly from DI computer systems in the final weeks of the individual's employment with DI, and wrongfully provided this information to AAR to assist AAR in gaining a competitive advantage over DI on the WASS Competition.

32.     Documents containing the wrongfully obtained DI Trade Secrets were brought by AAR senior leadership to numerous internal AAR meetings at which AAR's efforts to obtain the DI Trade Secrets, the DI Trade Secrets that AAR obtained through this wrongful conduct, and AAR's proposal for the WASS Competition were discussed.

33.     Documents containing the wrongfully obtained DI Trade Secrets were also brought to, reviewed by, and discussed during meetings of AAR's bid team for the WASS Competition.

34.     The DI Trade Secrets wrongfully obtained by AAR provided a detailed roadmap of DI's specific historical costs, pricing strategies and technical approaches, including

8

its staffing approach, which are the key discriminators and data needed to demonstrate to the State Department that an offeror for a State contract has a robust understanding of the contract requirements, and to propose a realistic and cost-effective solution that will be competitive. None of this highly confidential and proprietary DI information, including the DI Trade Secrets, which DI developed and accumulated through its own efforts, experience, and expense, and represents the culmination of the millions of hours expended by DI over its more than two decades performing the Incumbent Contract, is publicly available – rather, it is closely guarded, confidential, and economically valuable data.

35.     AAR used, without DI's express or implied consent, the Trade Secrets to prepare its proposal for the WASS Competition, including, upon information and belief, in developing its proposal strategy, and identifying and mitigating risk areas in its proposal.

36.     As a result of AAR's actions, DI was competitively harmed in the WASS Competition. The Trade Secrets wrongfully obtained by AAR permitted AAR to improve its competitive position to the detriment of DI, including, upon information and belief, reducing its bid price or costs, and improving its technical proposal by using DI cost, manpower, technical and schedule information as guidance.

37.     The members of AAR's senior leadership who obtained the DI Trade Secrets knew that their actions to obtain the Trade Secrets were illegal, tortious, and in violation of the former DI employees' strict confidentiality obligations to DI, but despite that actual knowledge, these members of AAR leadership intentionally, and in conscious disregard of DI's rights, pursued this course of conduct, knowing that it would seriously damage DI's business.

9

38.     AAR actively and knowingly participated in such conduct and its officers, directors and/or managers knowingly condoned, ratified, and/or consented to such conduct.

39.     In taking these actions, AAR acted with specific intent to harm DI and did in fact harm DI.

### The State Department Inspector General is Investigating AAR's Conduct

40.     On May 4, 2015, DI informed the State Department Contracting Officer and the State Department Inspector General that it had learned that AAR had obtained DI Trade Secrets relating to the WASS Competition, and asserted that AAR's misconduct was a violation of the Procurement Integrity Act, 41 U.S.C. §§ 2101-2107 ("PIA").

41.     The State Department Contracting Officer has referred the matter to the State Department Inspector General, which is actively investigating AAR.

42.     On May 7, 2015, DI filed a second protest with GAO alleging PIA and unfair competition violations by AAR impacting the WASS Competition, but with GAO specifically noting that the matter has been referred to the Inspector General, this protest was dismissed as premature due to the pendency of that investigation.

### AAR Admitted It Obtained DI Trade Secrets

43.     On May 4, 2015, the same day that DI informed the State Department of AAR's misappropriation of DI's Trade Secrets, AAR admitted to the State Department that it was in possession of a highly proprietary DI document called a Profit Margin Analysis ("PMA"). Notably, AAR did not say that the PMA was the only confidential DI information in its possession, nor did AAR reveal what use and/or disclosure it had made of the PMA and/or any other confidential DI information in its possession. AAR also did not reveal how it came to be in possession of the PMA.

44. The PMA, a detailed spreadsheet that contains approximately twenty discrete tabs, and collectively consists of nearly 10,000 rows of data, contains Trade Secrets about DI's quarterly and prior performance on the Incumbent Contract, including staffing, labor, costs, profit margins, overhead, revenue and other financial data, and provides direct insight into DI's operations and pricing strategies on the Incumbent Contract.

45. For example, the PMA contains detailed income statements showing DI's direct and indirect costs, gross profit from operations, general and administrative expenses, and unallowable costs on the Incumbent Contract. As noted, the PMA also includes detailed data about historical performance periods on the Incumbent Contract.

46. In total, the PMA contains thousands of lines of confidential financial data about DI's Incumbent Contract and spreadsheets which compute key financial metrics regarding the Incumbent Contract, including DI's revenues, costs, fees, and profit margins. DI takes all reasonable efforts to maintain the secrecy of the PMAs, including the one that AAR obtained and apparently is still in its possession, including by not intentionally releasing it to competitors or third parties (except to business partners who have a need for access to such information and who have executed agreements to maintain its confidentiality) and requiring its employees and agents to sign agreements confirming their obligation to maintain the confidentiality of such information.

47. AAR wrongfully obtained the PMA and wrongfully failed to promptly return the PMA to DI upon receiving it.

48. The PMA, like the other Trade Secrets that AAR wrongfully obtained and retained, has significant, independent economic value because it is maintained confidentially,

not generally known by those who can obtain economic value from its disclosure, and cannot be ascertained through obvious means by those who can obtain value from it.

49.     Despite acknowledging to the State Department that it is in possession of DI Trade Secrets, AAR has neither (a) returned the DI Trade Secrets in its possession; (b) disclosed the extent of its misappropriation and misuse of DI Trade Secrets; nor (c) certified that it did not use any DI Trade Secrets in preparation of its WASS program bid.

## Damages

50.     DI has sustained significant damages, yet to be completely identified and quantified, that are the direct and proximate result of the wrongful actions of AAR which are described herein.

51.     Such damages are ongoing and include, but are not limited to, the following:

a.  Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, to DI's business and operations resulting from the theft, conversion and wrongful use of the Trade Secrets by AAR for the benefit of AAR and to the detriment of DI, which affected DI's ability to fairly compete in the WASS Competition;

b.  Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, to DI's business and operations resulting from the impairment of its investment in the WASS program and its bid proposal for the WASS Competition, which investment was adversely affected as a direct and proximate result of the wrongful actions of AAR; and,

c.  Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, in regard to AAR's obtaining the Trade Secrets, which have significant economic value, thereby depriving DI of exclusive use of this information.

12

52.     Such damages significantly exceed $75,000.

53.     DI is, and continues to be, irreparably harmed by AAR's continued unlawful possession and use of DI's Trade Secrets, including in connection with the preparation and submission of its proposal for the WASS Competition, which is ongoing, as well as any future proposal revisions that the State Department seeks during the WASS Competition.

54.     DI is, and continues to be, irreparably harmed by AAR's continued unlawful possession of and ability to use DI's Trade Secrets in connection with future competitions for federal government contracts in which DI and AAR will compete.

55.     Unless AAR is ordered to return the Trade Secrets and enjoined from making any further use of them, AAR will continue to knowingly, dishonestly and intentionally capitalize on the DI Trade Secrets to which it has no rightful claim or license.

## COUNT I

### (Violation of Florida Uniform Trade Secrets Act)

56.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

57.     This is a claim against AAR for its violation of the Florida Uniform Trade Secrets Act, § 688.001, et seq., Florida Statutes.

58.     At all times material hereto, all right, title and interest in the Trade Secrets misappropriated by AAR resided with, and continues to reside with, DI, and DI is the sole owner of the Trade Secrets.

59.     AAR knowingly, dishonestly, willfully, maliciously, wrongfully, and intentionally obtained DI's Trade Secrets, and knowingly, dishonestly, willfully, maliciously, wrongfully and intentionally used and continues to use and benefit from, DI's Trade Secrets for

13

its own benefit, without DI's express or implied consent. Such use and continued use constitutes misappropriation of DI's confidential, proprietary and trade secret information in violation of Florida's Uniform Trade Secrets Act, § 688.001, et seq., Florida Statutes.

60.     DI has taken reasonable steps to protect its trade secrets by instituting internal company policies and procedures regulating access to, designation of, and dissemination of its proprietary and trade secret information, and by other means, including by requiring its employees and agents to sign confidentiality and non-disclosure agreements which prohibit the disclosure of proprietary and trade secret information without DI's express written consent, such Trade Secrets deriving independent economic value from not being generally known to the public.

61.     At all times material hereto, DI has had the continued right to exclusive ownership, enjoyment, and use of its proprietary and trade secret information, without interference from AAR.

62.     AAR obtained the Trade Secrets and knew, or had reason to know, that the Trade Secrets had been obtained by improper means. At all times material hereto, AAR knew that such information was trade secret information, belonged exclusively to DI, was highly sensitive, confidential and proprietary, and that the sources of the information, including the former DI employees, had contractual duties, fiduciary duties and duties of loyalty that prohibited them from disclosing this information. AAR deliberately induced these former DI employees to breach their duties to DI.

63.     In addition, without DI's express or implied consent, AAR disclosed or used the Trade Secrets, having used improper means to acquire knowledge of the Trade Secrets and/or knew or had reason to know that it had obtained the Trade Secrets from or through

former DI employees who owed a continuing duty to DI to maintain their secrecy and limit their use.

64.     AAR's misappropriation of DI proprietary information including trade secrets was willful and malicious.

65.     As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 51 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

## COUNT II

### (Conversion)

66.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

67.     At all times material hereto, all right, title, and interest in the proprietary and trade secret information misappropriated by AAR resided, and continues to reside, with DI.

68.     DI is the sole owner of the proprietary and trade secret information misappropriated by AAR.

69.     DI was in possession of, and had the right to sole possession of, the proprietary and trade secret information at the time it was misappropriated by AAR.

70.     AAR knowingly, intentionally and wrongfully procured, obtained, and exercised authority and dominion over – and has knowingly, intentionally, wrongfully retained, converted to its own use, capitalized on the value of, and deprived DI of the benefits of sole possession of, DI's proprietary and trade secret information, without DI's consent or authorization, and in a manner contrary to DI's rights and inconsistent with DI's ownership interests.

71.     At all times material hereto, AAR knew that the information it misappropriated from DI was proprietary and/or a trade secret, belonged exclusively to DI, and was proprietary to DI.

72.     AAR's actions constitute a knowing, unlawful, and intentional conversion of DI's proprietary and trade secret information for AAR's economic benefit, and to the economic detriment of DI.

73.     Due to the nature of the Trade Secrets converted, the fact that AAR – specifically including through its senior leadership – deliberately intended to deprive DI of sole possession of its Trade Secrets and actively conspired with former DI employees to do so, and the fact that DI did not learn of AAR's misappropriation of its Trade Secrets until after AAR had used those Trade Secrets to prepare its bid for the WASS Competition, it would have been futile to demand that AAR return DI's confidential information. Instead, DI put AAR's corporate parent, AAR Corp., on notice of AAR's wrongful conduct and demanded that AAR Corp. address that conduct.

74.     As a direct and proximate result of AAR's conversion of the proprietary and trade secret information belonging to DI, as described herein, DI has sustained actual damages as described in paragraph 51.

## COUNT III

### (Tortious Interference With Contractual Relations)

75.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

76.     Valid and enforceable confidentiality and non-disclosure agreements existed between DI and its employees, pursuant to which its employees agreed not to disclose any proprietary and trade secret information belonging to DI.

16

77.     AAR knew or should have known of the existence of the contracts between DI and its employees and the obligation of DI's employees not to disclose proprietary and trade secret information belonging to DI.

78.     AAR intentionally and improperly interfered with – and procured and induced the breach of – these contractual requirements between DI and its employees.

79.     AAR had no justification, privilege or right to interfere with, or procure or induce the breach of, these contracts between DI and its employees.

80.     As a direct and proximate result of AAR's tortious interference with DI's contractual relations as described herein, DI has sustained actual damages as described in paragraph 51.

## COUNT IV

**(Tortious Interference With Existing and Prospective Business Relations)**

81.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

82.     An ongoing business relationship exists between DI and State regarding the WASS program, pursuant to the Incumbent Contract.

83.     DI has existing and prospective contractual rights pursuant to that business relationship.

84.     DI sought to continue its business relationship with State through the WASS Competition.

85.     AAR had knowledge of DI's existing and prospective business relationship with State.

86.     AAR intentionally and improperly interfered with DI's existing and prospective business relationship with State, including by using the Trade Secrets that AAR

17

misappropriated from DI to develop its WASS proposal strategy, identify and mitigate risk areas in its proposal, and obtain an unfair competitive advantage over DI.

87.     Were it not for AAR's wrongful conduct, DI would have been able to compete fairly with AAR in the WASS Competition, and AAR would have received lower evaluation scores in the WASS Competition.

88.     As a result of AAR's wrongful conduct, DI was prevented from continuing its existing business relationship with State and from entering into a prospective business relationship with State.

89.     AAR had no justification, privilege or right to interfere with the existing and prospective business relationship between DI and State.

90.     As a direct and proximate result of AAR's tortious interference with DI's existing and prospective business relationship, as described herein, DI has sustained actual damages as described in paragraph 51.

## COUNT V

### (Aiding and Abetting Breach of Fiduciary Duty)

91.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

92.     The former DI employees who had access to the Trade Secrets owed fiduciary duties, including a duty of loyalty, to DI.

93.     These fiduciary duties (including the duty of loyalty) precluded the DI employees from using the DI Trade Secrets, to which they had access while employed by DI, to the advantage of AAR, and against the interests of DI, either during their employment relationship with DI or after that employment relationship was over.

94.     The former DI employees breached their fiduciary duties to DI by giving and disclosing the Trade Secrets to AAR.

95.     AAR knew of the existence of the fiduciary duties and participated in the breach of those duties by the DI employees.

96.     AAR induced, encouraged and provided substantial assistance to this breach of fiduciary duty, including by hiring the DI employees and then pressuring them to disclose DI Trade Secrets to AAR.

97.     AAR's substantial inducement and encouragement of, and assistance in, this breach of fiduciary duty was done with a deliberate and conscious intent by AAR, and/or with recklessness by AAR and in violation of AAR's duty to disclose the breach.

98.     As a direct and proximate result of AAR's aiding and abetting the former DI employees' breach of fiduciary duty as described herein, DI has sustained actual damages as described in paragraph 51.

## COUNT VI

### (Unjust Enrichment)

99.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

100.     As described herein, AAR unlawfully, intentionally, and knowingly solicited, obtained and used DI's highly sensitive, proprietary and trade secret information in violation of applicable law.

101.     At all times material hereto, AAR knew that such benefits were conferred upon it, and voluntarily accepted and retained such benefits, knowing that the information had been misappropriated from DI.

19

102.     At all times material hereto, AAR would be unlawfully and unjustly enriched if it were allowed to enjoy the benefits derived from such proprietary and trade secret information without being required to compensate the party responsible for conferring those benefits.

103.     The fair value of the benefits conferred on and obtained by AAR is the value it has derived from obtaining and using the proprietary and trade secret information, and from its ongoing use of such information, including in the preparation and submission of its proposal for the WASS Competition and for other business purposes. Accordingly, AAR has been unjustly enriched in an amount to be determined at trial, and DI is entitled to be paid that same amount.

104.     As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 51 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

## COUNT VII

### (Conspiracy)

105.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

106.     AAR conspired with others known and unknown to DI, including the former DI employees from whom AAR obtained proprietary information including DI trade secrets, to knowingly, intentionally, and unlawfully solicit, obtain, and use DI proprietary and trade secret information in connection with the preparation and submission of its proposal for the WASS Competition.

107.     As alleged in this Complaint, the acts which AAR conspired to do were unlawful.

108.    AAR and the individuals and entities with which AAR conspired took overt acts in pursuance of the conspiracy, including by soliciting and obtaining DI trade secrets and using those trade secrets in the preparation and submission of its proposal for the WASS Competition.

109.    As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 51 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

## COUNT VIII

### (Violation of Florida's Unfair and Deceptive Trade Practices Act)

110.    DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 55 as if fully set forth herein.

111.    This is a claim against AAR for violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201, et seq., Florida Statutes.

112.    AAR engaged in tortious misconduct including specifically targeting and hiring experienced DI employees who worked on the Incumbent Contract and had access to DI Trade Secrets regarding that program, and unlawfully inducing or otherwise causing these DI employees to end their employment with DI, causing harm to DI and interfering with ongoing contractual and other business relations with the employees, and causing harm to DI and interfering with ongoing contractual and other business relations with the WASS program and the Incumbent Contract serviced by DI and these employees.

113.    AAR engaged in tortious misconduct including aiding and abetting the breach of the fiduciary duty of current and former DI employees.

114.    AAR knowingly, dishonestly, wrongfully and intentionally obtained DI's Trade Secrets, and wrongfully used, and continues to use, DI's Trade Secrets for its own

21

benefit. Such use and continued use constitutes the theft and misappropriation of DI's confidential, proprietary, and trade secret information under Florida law, which AAR knowingly and willingly violated.

115.    AAR knowingly, dishonestly, wrongfully and intentionally obtained DI's Trade Secrets, and wrongfully used, and continues to use and benefit from, DI's Trade Secrets, in breach of its duty not to obtain or use such proprietary and trade secret information. AAR knowingly, dishonestly, wrongfully, and intentionally obtained DI's Trade Secrets, and wrongfully used, and continues to use and benefit from, DI's Trade Secrets, knowing that the sources of the information, including the former DI employees, had contractual duties, fiduciary duties, and duties of loyalty that prohibited them from disclosing this information, and induced them to provide such information in breach of those duties. All of the foregoing acts constitute violations of applicable Florida law, which AAR knowingly and willingly violated.

116.    AAR's wrongful actions described throughout this Complaint, and in paragraphs 112 through 115 in particular, constitute unconscionable, unethical, unfair and deceptive trade practices in violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201, et seq., Florida Statutes. AAR knew, or reasonably should have known, that its actions were unconscionable, unethical, unfair and deceptive methods of competition and of conducting business and that such actions were wrongful and violated applicable law.

117.    As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 51 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

## PRAYER FOR RELIEF

DI respectfully requests that this Court enter judgment in favor of DI and against AAR and grant DI:

A. Actual and compensatory damages, including lost profits, in amounts to be proven at trial;

B. Preliminary and permanent injunctive relief, including an order requiring AAR to return and not to use the DI information that AAR obtained, and to prevent the continued targeting of DI employees with knowledge of DI trade secrets and coercion of current or former DI employees to provide DI trade secrets to AAR as well as any other affirmative acts that may be necessary to protect the Trade Secrets;

C. Enhanced damages pursuant to Florida's Uniform Trade Secrets Act (FUTSA), Fla. Stat. §§ 688.001-009, specifically § 688.004(2);

D. Punitive damages and exemplary damages;

E. Attorneys' fees, including attorneys' fees recoverable under Florida's Unfair and Deceptive Trade Practices Act and the Florida Uniform Trade Secrets Act, costs, and pre-judgment and post-judgment interest; and,

F. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), DI demands a trial by jury on all claims so triable of right.

Dated: September 4, 2015

Keith J. Hesse, Esquire
Florida Bar No. 348007
Nicole R. Turcotte, Esquire
Florida Bar No. 102886
**Shuffield, Lowman & Wilson, P.A.**
1000 Legion Place, Suite 1700
P.O. Box 1010
Orlando, FL 32802-1010
Telephone: (407) 581-9800
Facsimile: (407) 581-9801
Email: khesse@shuffieldlowman.com
        nturcotte@shuffieldlowman.com
        litservice@shuffieldlowman.com

*Local Counsel for Plaintiff*
*DynCorp International LLC*

**REED SMITH LLP**
A. Scott Bolden (Trial Counsel)*
Lawrence P. Block*
1301 K Street, N.W.,
Suite 1100 – East Tower
Washington, D.C. 20005
Tel: (202) 414-9266
Fax: (202) 414-9299
ABolden@reedsmith.com
LBlock@reedsmith.com

Tracy Zurzolo Quinn*
Matthew P. Frederick*
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
TQuinn@reedsmith.com
MFrederick@reedsmith.com

*Attorneys for Plaintiff*
*DynCorp International LLC*

*Pro Hac Vice Application Forthcoming*

24

## **VERIFICATION**

STATE OF FLORIDA

COUNTY BREVARD

     I, the undersigned, Steven Ziarno, am employed by DynCorp International LLC as Senior

Compliance Officer and Investigator.  As such, I have personal knowledge of the facts set forth

in the attached Verified Complaint.  I have reviewed the allegations of facts set forth in the

Verified Complaint and under penalty of perjury under the laws of the United States of America

and the State of Florida hereby verify that said facts are true, correct, and accurate to the best of

my knowledge.

 

 

Steven Ziarno
DynCorp International LLC

 

Dated this 4 day of *September*, 2015.