UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DYNCORP INTERNATIONAL LLC,

      Plaintiff,

v.

AAR AIRLIFT GROUP, INC.,

      Defendant.

Case No. 6:15-cv-1454-Orl-31GJK

**ANSWER AND DEFENSES OF
DEFENDANT AAR AIRLIFT GROUP, INC.**

Defendant, AAR Airlift Group, Inc. ("AAR"), by and through its undersigned attorneys, hereby provides its Answer and Affirmative Defenses to the First Amended Complaint (Doc. 52) filed by DynCorp International LLC ("DI").  AAR responds to the separately numbered paragraphs of the First Amended Complaint as follows:

## CASE OVERVIEW

1.  This case is about the misappropriation and unlawful use of confidential and proprietary information, including trade secrets - not about routine employee poaching.

> **ANSWER:** AAR denies the allegations contained in Paragraph 1 and further denies any implication that it engaged in any unlawful or any improper actions related to any current or former DI employees.

2.  Defendant AAR Airlift Group, Inc. ("AAR") schemed to obtain and use - and did obtain and use - Plaintiff DynCorp International LLC's ("DI's") trade secrets and other confidential and proprietary information to bid against DI in a recently reopened

competition for a multi-billion dollar, follow-on, State Department contract – one of the largest procurements in the history of the State Department.

**ANSWER:** AAR denies the allegations in Paragraph 2.

3.      This matter is being investigated by the federal government.

**ANSWER:** AAR denies the allegations in Paragraph 3.

4.      DI is the incumbent contractor and this flagship contract has been held by DI for over two decades.

**ANSWER:** AAR admits that DI is the incumbent contractor on Department of State Contract No. SAQMPD05C1103 and that DI has held that contract for over two decades.  AAR lacks knowledge and information necessary to assess the truth or falsity of the allegation that the contract is a "flagship" contract and, therefore, denies that allegation.  AAR denies the remaining allegations in Paragraph 4.

5.      On October 13, 2015, after previously having excluded DI from consideration for the new contract, the government reinstated DI into the competition.  As a result, both DI and AAR will be required to submit revised proposals after negotiations with the State Department.  To the extent AAR has confidential and proprietary DI information in its possession relating to the current contract – as alleged herein and as AAR has already admitted – that information will be of considerable value to AAR in preparing its revised bid proposal to its competitive advantage.

**ANSWER:** AAR admits that DI was excluded from consideration for the new contract and that the government reinstated DI into the competition and that both DI and AAR were required to and did submit revised proposals to the State Department.

AAR states that the State Department thereafter awarded the contract to AAR. AAR denies the remaining allegations contained in Paragraph 5.

6.     DI believes that DI and AAR are the only competitors for the follow-on contract.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation concerning DI's belief and, accordingly, denies the allegations in Paragraph 6.

7.     To obtain DI confidential and proprietary information, AAR targeted and hired DI's employees with access to confidential and proprietary information, including trade secrets, relating to DI's performance as the 20-year incumbent on the State Department contract, and then tortiously induced the former DI employees to turn over DI confidential and proprietary information to AAR in violation of their known contractual and fiduciary obligations to DI.

**ANSWER:** AAR denies the allegations in Paragraph 7.

8.     DI first learned of AAR's scheme from an individual, Witness A,[1] who worked as a manager in AAR's Human Resources Department during the relevant time and stepped forward, on an unsolicited basis, to expose AAR's tortious and unlawful conduct. Witness A provided first-hand knowledge to DI regarding AAR's collection and use of DI

---

[1] DI is not disclosing Witness A's name at this time to protect the privacy of the witness and because of an ongoing federal investigation of AAR. DI will provide Witness A's name to AAR in the course of discovery and under a protective order. Witness A currently works for an unrelated third party that is not involved in this action and has never worked for DI.

confidential and proprietary information in preparing AAR's bid for the State Department contract.

> **ANSWER:** AAR lacks knowledge sufficient to assess the truth or falsity of the allegations in Paragraph 8 concerning DI's relationship and interactions with Witness A and the allegations concerning Witness A's current position and, accordingly, denies those allegations.  AAR admits that Witness A worked at AAR as a Manager, Recruitment in AAR's HR Department.  AAR denies the remaining allegations in Paragraph 8, including footnote 1 appended thereto, and specifically denies that it engaged in any scheme or any tortious, unlawful, or improper conduct.

9.      In addition to and wholly apart from the evidence provided by Witness A, AAR admitted to the State Department – albeit in a misleading manner – that AAR improperly came into possession of a highly confidential and proprietary DI document called a Profit Margin Analysis ("PMA").  As yet, the PMA is the only one of DI's confidential and proprietary documents that AAR has admitted to having obtained.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required as it pertains to the PMA.  To the extent a response is required, AAR denies the allegations in Paragraph 9 concerning the PMA. Additionally, AAR denies the remaining allegations in Paragraph 9.

10.     The PMA contains over 10,000 rows of highly confidential data about DI's staffing, costs, profit margins, revenue, overhead, and other financial data related to DI's performance on the incumbent contract for the program for which DI and AAR are now competing.  The PMA includes extremely valuable confidential information for any company seeking to unseat DI as the incumbent on the State Department contract.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR denies the allegations in Paragraph 10 and specifically denies that it has knowledge of the contents of the PMA.

11.     Despite AAR's representations to the contrary, AAR has failed to take the necessary steps to appropriately and permanently remove the PMA from its possession, so as to ensure that AAR does not use the information in preparing its final revised proposal.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR denies the allegations in Paragraph 11.

12.     AAR compounded this failure by misleading the State Department as to its purported destruction of the PMA.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.   To the extent a response is required, AAR denies the allegations in Paragraph 12.

13.     The PMA is an example of the kinds of data believed to be obtained improperly by AAR.   AAR did not advise the State Department whether AAR was in possession of any other DI confidential data, nor has AAR denied having any other DI confidential data.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required as it pertains to the PMA.   To the extent a response is required, AAR denies the allegations in Paragraph 13 concerning the PMA. Additionally, AAR denies the remaining allegations in Paragraph 13.

14.     So long as AAR has DI's confidential information, including trade secrets, AAR will be able to leverage that tortiously obtained DI confidential information to DI's competitive disadvantage, causing real harm.

**ANSWER:** AAR denies the allegations contained in Paragraph 14.

15.     Although the State Department Office of Inspector General is investigating this matter, there is no private cause of action or relief available to DI in the State Department contract competition, or in any administrative proceeding, to protect DI's confidential and proprietary information, including trade secrets, from misuse by AAR, or compel AAR to return that information.  DI's remedy lies in tort.  Unless AAR's tortuous conduct is remedied, AAR will continue to improperly use the DI trade secrets and other confidential and proprietary information against DI in AAR's upcoming proposal for this critical procurement and in other federal procurements on which the parties regularly compete.

> **ANSWER:** The allegations in Paragraph 15 relating to the existence or non-existence of a cause of action and available relief state conclusions of law to which no response is required.  To the extent a response is required, AAR denies those allegations.  AAR denies the remaining allegations in Paragraph 15.

16.     For the reasons set forth below, AAR is liable for: (1) violation of Florida's Uniform Trade Secrets Act; (2) conversion; (3) tortious interference with contractual relations; (4) tortious interference with existing and prospective business relations; (5) aiding and abetting breach of fiduciary duty; (6) unjust enrichment; (7) conspiracy; and (8) violation of Florida's Unfair and Deceptive Trade Practices Act.

> **ANSWER:** AAR denies the allegations in Paragraph 16.

**THE PARTIES**

17.     DI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Virginia and its principal office at 1700 Old Meadow Road, McLean, VA 22102. DI's sole member is DynCorp International, Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Virginia and its principal office at 1700 Old Meadow Road, McLean, VA 22102.

> **ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 17 and, accordingly, denies the allegations in Paragraph 17.

18.     AAR is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in the State of Florida and its principal office at 2301 Commerce Park Drive, NE, Palm Bay, Florida 32905-2611.

> **ANSWER:** AAR admits the allegations in Paragraph 18.

**JURISDICTION AND VENUE**

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because the amount in controversy in this case exceeds the sum of $75,000, exclusive of interest and costs, and the parties are of diverse citizenship.

> **ANSWER:** AAR admits that this Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). AAR denies any implication that it acted in unlawfully or improperly in any way and denies any implication that it is liable to DI in any way.

20.     This Court has personal jurisdiction over Defendant and venue is proper in the District and Division in which this Court sits because at all times material hereto: (a) Defendant was and is a corporation organized under the laws of the State of Florida, with its principal place of business in this District and Division; (b) Defendant was and is maintaining an office for transaction of its customary business in this District and Division; and (c) a substantial portion of the events giving rise to the claims in this action occurred within the jurisdictional boundaries of this District and Division.

> **ANSWER:** AAR admits for purposes of this matter only that this Court has personal jurisdiction over AAR in this action and that venue is proper in the District and Division in which the Court sits.  AAR denies any implication that it acted in unlawfully or improperly in any way and denies any implication that it is liable to DI in any way.

## ADDITIONAL FACTUAL ALLEGATIONS

### Background

21.     DI is a multi-billion dollar company that provides critical aircraft maintenance, logistics support, law enforcement and intelligence training, and base and contingency operations around the world on behalf of the U.S. government in furtherance of national security interests.  DI has a proven track record on many of the most challenging federal contracts, often in overseas and austere war zones in support of the U.S. warfighter.  DI routinely competes against other contractors, such as AAR, on many federal contracts.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 21 and, accordingly, denies the allegations in Paragraph 21.

22.     At present, DI and AAR are competing for the award of a federal government contract under Solicitation No. SAQMMA14R0319 ("Solicitation").  The Solicitation was issued on July 18, 2014, by the U.S. Department of State ("State Department") Bureau of International Narcotics and Law Enforcement Affairs, Office of Aviation ("INL/A") in support of State's Worldwide Aviation Support Services ("WASS") program.

**ANSWER:** AAR admits that the Solicitation was issued on July 18, 2014 by the U.S. Department of States' Bureau of International Narcotics and Law Enforcement Affairs, Office of Aviation in support of the Worldwide Aviation Support Services program.  AAR further admits that DI and AAR competed for award of the contract contemplated by the Solicitation.  AAR states that the State Department ultimately awarded the contract to AAR in or about September 2016.  AAR denies the remaining allegations in Paragraph 22.

23.     The competition under the Solicitation ("WASS Competition") is for the award of a multi-billion-dollar contract for the provision of aviation and related services in support of counter-narcotics operations and illicit drug eradication efforts in numerous countries around the world, including, among others, Afghanistan, Pakistan, Colombia, Iraq and Peru.

**ANSWER:** AAR admits that the WASS Competition was for the award of a contract for the provision of aviation and related services in support of counter-narcotics operations and illicit drug eradication efforts in numerous countries around the world, including, among others, Afghanistan, Pakistan, Colombia, Iraq and Peru. AAR states that the State Department changed the list of identified countries in amendments to the Solicitation. AAR states that the State Department awarded a contract to AAR in or about September 2016 and that the contract has a potential value of more than one billion dollars. AAR denies the remaining allegations in Paragraph 23.

24. The WASS program is a complex and challenging contract, requiring significant management resources to support operations, maintenance and logistics on multiple continents, often in hostile and austere environments.

**ANSWER:** AAR denies that the WASS program is a contract. AAR respectfully refers the Court to the Solicitation, as amended, for its contents, including its description of the contract resulting therefrom. AAR denies the remaining allegations in Paragraph 24.

25. The scope of the program requires vast expertise, experience and resources to provide safe and efficient aviation support, strengthen law enforcement, and support counter-narcotics and counterterrorism efforts.

**ANSWER:** AAR respectfully refers the Court to the Solicitation, as amended, for its contents, including its description of the contract resulting therefrom. AAR denies the remaining allegations in Paragraph 25.

26.     DI has been performing as the incumbent contractor on the WASS program through a predecessor contract ("Incumbent Contract") for over 23 years, providing excellent service, worth billions of dollars, to the State Department.

> **ANSWER:** AAR admits that DI has been performing as the incumbent contractor on the WASS program through a predecessor contract for over 23 years.  AAR lacks knowledge and information sufficient to assess the truth or falsity of the remaining allegations in Paragraph 26 and, accordingly, denies those allegations.

27.     Under the Incumbent Contract, DI provides a highly trained, courageous and professional team of more than one thousand five hundred personnel spanning eight countries, directly supporting the diplomatic and security interests of the United States and its allies around the world.

> **ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 27 and, accordingly, denies those allegations.

28.     On January 28, 2015, DI learned that – despite its excellent work on the Incumbent Contract – it was excluded from the WASS Competition by the State Department.

> **ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 28 and, accordingly, denies those allegations.

29.     DI believes that AAR remained as the only entity in the competition following DI's exclusion.

> **ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 29 and, accordingly, denies those allegations.

30.     DI filed a protest of its exclusion from the WASS Competition with the United States Government Accountability Office ("GAO") on February 12, 2015.

**ANSWER:** AAR admits the allegations in Paragraph 30.

31.     In its protest, DI alleged, among other things, that the State Department materially misevaluated its proposal, and that, but for these errors, DI would not have been excluded from, and would have won, the WASS Competition.

**ANSWER:** AAR respectfully refers the Court to DI's protest for its contents.  AAR denies the remaining allegations in Paragraph 31.

32.     In response to DI's protest, on March 18, 2015, the State Department agreed and voluntarily decided to take corrective action, stating that it would re-evaluate the DI and AAR proposals and reconsider its competitive range determination.

**ANSWER:** AAR admits that on March 18, 2015, the State Department informed the GAO that it had decided to reevaluate AAR's and DI's proposals and make a new competitive range decision.  AAR states that the State Department awarded a contract to AAR in or about September 2016.  AAR denies the remaining allegations in Paragraph 32.

33.     On October 13, 2015, as a result of its reevaluation of the proposals, the State Department informed DI that it determined a new competitive range, which now includes DI, and is initiating written discussions with offerors in the competitive range (including DI and AAR) to obtain revised bid proposals.  Under applicable provisions of the Federal Acquisition Regulation ("FAR"), upon the establishment of a competitive range, and the completion of discussions with offerors in that range, the government is

legally obligated to seek revised proposals from offerors and make an award based on those revised proposals.

**ANSWER:**  AAR admits that the State Department determined a new competitive range in or about October 2015 and thereafter entered into discussions with offerors in the competitive range, including AAR and DI, and called for revised proposals.  To the extent the allegations in Paragraph 33 purport to characterize requirements of the Federal Acquisition Regulation ("FAR"), they state legal conclusions as to which no response is required.  To the extent a response is required, AAR denies those allegations.  AAR states that the State Department awarded a contract to AAR in or about September 2016.  AAR denies the remaining allegations in this paragraph.

34.     The WASS procurement will be awarded to the offeror that represents the "best value" to the government based on an integrated assessment of various factors including the offerors' management, operations, maintenance, logistics and cost.  In a best value procurement, the contract will be awarded to the offeror that proposes the most advantageous combination of technical strengths and benefits, offset by any weaknesses or disadvantages, and considering the price, as compared to the proposals submitted by other offerors.  Accordingly, in a best value procurement, the government is looking for a contractor that offers novel and efficient technical solutions that pose minimal risk of failure, may achieve cost savings, and, most importantly, will achieve the stated goals and objectives of the government in a timely manner.

**ANSWER:**  To the extent the allegations in Paragraph 34 purport to characterize requirements in a best value procurement, they state conclusions of law to which no

response is required. To the extent a response is required, AAR denies those allegations. AAR states that the State Department awarded a contract to AAR in or about September 2016. AAR denies the remaining allegations in Paragraph 34.

35. The WASS procurement involves a very large, complex, multi-national services contract. As such, success on the WASS procurement depends heavily on proposing a labor force with the correct mix of experience, qualifications and numbers for each position solicited by the government, to ensure that the work is done in a timely and proper manner that achieves the government's requirements with minimal risk of program interruption or failure. As such, these attributes (which can be gleaned from personnel lists and salary information demonstrating the current staffing mixes and compensation, as well as from other contract financial information) are key discriminators that the government will focus on in its evaluation and selection of the best value offeror for the job. Accordingly, a successful incumbent's (such as DI's) on-the-ground, confidential and proprietary technical know-how and experience (including, *e.g.,* knowing which and how many positions to staff with which and how many people and with what qualifications at what pay in order to achieve a particular objective in a particular theater of operation) thus comprises highly commercially valuable information that a competitor could use to prepare a more competitive bid and increase its chances for award.

**ANSWER:** AAR admits that the WASS procurement involves a large, complex, multi-national services contract. AAR denies the remaining allegations in Paragraph 35.

**AAR Misappropriated Confidential, Proprietary and Trade Secret Information, by Tortiously Targeting DI Employees and Inducing Them to Disclose the Information**

36.     Following the State Department's decision to re-evaluate proposals in March 2015, DI learned that AAR had misappropriated DI's trade secrets and other confidential information relating to the WASS program and used that information in connection with the preparation and submission of its proposal in the WASS Competition.  The trade secrets obtained by AAR included confidential and proprietary DI financial and technical data relating to the Incumbent Contract, such as lists of the personnel employed by DI to provide services under the Incumbent Contract, the salaries and pay differentials for those personnel on the Incumbent Contract, other pricing and financial data about DI's performance on the Incumbent Contract, and technical data about DI's staffing approach and business operations pertaining to the  Incumbent Contract.

**ANSWER:** AAR denies the allegations in Paragraph 36.

37.     DI learned of AAR's misappropriation of DI trade secrets from Witness A, who reported AAR's misconduct, on an unsolicited basis, to DI on April 27, 2015, and provided additional details shortly thereafter.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 37, including specifically the allegations purportedly made by Witness A.

38.     Witness A worked as a manager in the AAR Human Resources department during the relevant time period, specifically including the time AAR was preparing its WASS bid submission, and attended AAR bid proposal planning sessions.

-16-

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 38, including specifically the allegations purportedly made by Witness A.

39.     Witness A reported to DI that AAR repeatedly had hired away DI employees with access to confidential information regarding DI's performance under the Incumbent Contract and then induced those employees to disclose confidential DI information to AAR for AAR's use in preparing its own bid submission.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 39, including specifically the allegations purportedly made by Witness A.

40.     Witness A reported to DI that senior members of AAR management were involved in these efforts, specifically including:  (a) Randy Martinez, AAR President; (b) Kyle McGillivray, AAR Vice President of Human Resources; (c) Steven Harrison, AAR Vice President of Business Development; (d) Tim Chilvry, AAR Senior Vice President; and (e) Martin Wax, AAR Vice President of Logistics.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in

Paragraph 40, including specifically the allegations purportedly made by Witness A.

41.     The DI employees that AAR hired included at least:  (a) (James) Christian Thomas (DI Senior Contracts Manager); (b) Angela Pilkington (DI Accounting Manager); and (c) Terrance Fisher (DI Sourcing Senior Manager).  Each of these individuals had access to confidential and proprietary DI information relating to its performance under the Incumbent Contract including, among other things, personnel lists, salary information (which can show staffing mix and approaches), and other contract and financial data.

**ANSWER:** AAR admits that, at separate times, it hired James Christian Thomas, Angela Pilkington, and Terrance Fisher.  AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 41 concerning what access Mr. Thomas, Ms. Pilkington, and Mr. Fisher had to information when they were DI employees and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 41 including specifically any allegation that it acted unlawfully or improperly in any way in hiring any employee.

42.     Specifically, Thomas had access to DI records such as proposals, contract modifications, spreadsheets showing pricing and other WASS contract and financial information. As a senior manager of contracts at DI, Thomas' role was all-encompassing, such that Thomas was part of the entire business and operational process for the Incumbent Contract.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 42 concerning what access Mr. Thomas had to information when he was a DI employee and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 42.

43.     Pilkington, as a DI Senior Accountant, had access to all financial documents related to the Incumbent Contract including profit and loss statements, disclosures regarding DI's indirect cost pools, and financial information separated by each country in which DI provided services under the Incumbent Contract.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 43 concerning what access Ms. Pilkington had to information when she was a DI employee and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 43.

44.     Witness A reported that at least Thomas and Pilkington provided confidential and proprietary DI information to AAR, while Fisher refused to do so.  In particular, with regard to these former DI employees, Witness A reported the following, all of which took place in the 2012-2014 time frame, when AAR was preparing its initial bid submission for the WASS Competition:

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 44, including specifically the allegations purportedly made by Witness A.

a.     **Christian Thomas:**  AAR hired Thomas as its Director of Contracts.  Witness A personally observed Thomas with a large black, zippered portfolio of written material that he claimed to have taken from DI.  The binder included at least lists of DI employees staffed on DI's Incumbent Contract and their salary information, as well as numerous emails and other documents with DI logos.  Witness A personally observed Thomas, on one of his first days after joining AAR, share the portfolio with the AAR bid team charged with preparing AAR's WASS bid submission.  The AAR bid team members who reviewed the portfolio with Thomas included McGillivary (AAR Vice President of Human Resources), Harrison (AAR Vice President of Business Development) and Chilvry (AAR Senior Vice President).  Witness A also observed Martinez (AAR President) review the DI portfolio of material from Thomas and ask questions regarding its contents during a bid proposal meeting.   Witness A reported that Thomas was known to have downloaded numerous documents from DI in his last weeks of DI employment before joining AAR.

> **ANSWER:** AAR admits that Christian Thomas has been employed by AAR in the role of Director, Contract Administration.   AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 44(a), including specifically the allegations purportedly made by Witness A.

b.     **Angela Pilkington**:  Witness A reported that Pilkington provided AAR with DI confidential financial information relating to DI's incumbent contract costs and pricing.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 44(b), including specifically the allegations purportedly made by Witness A.

c.      **Terrance Fisher**:  Witness A reported a conversation with Fisher in which Fisher told Witness A that Martinez (AAR President) had asked him to provide confidential DI information.   When Fisher refused, Martinez responded, "I'm sorry, who signs your paycheck?" AAR fired Fisher shortly after his refusal to provide confidential DI information.

**ANSWER:** AAR lacks knowledge and information sufficient to assess the truth or falsity of the allegation that Witness A communicated with DI and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 44(c), including specifically the allegations purportedly made by Witness A.

45.      As described above, AAR's tortious misconduct included specifically targeting and hiring former experienced DI employees who worked on DI's Incumbent Contract and had access to DI's trade secrets regarding that program, including DI's confidential and proprietary staffing mixes, levels, approach and pay, and who had contractual and fiduciary obligations to DI not to use or disclose DI trade secrets for any unauthorized purpose, and inducing these former DI employees to violate their confidentiality obligations to DI by providing AAR with the trade secrets.

**ANSWER:** AAR denies the allegations in Paragraph 45.

46.     Like many government contracts of this magnitude and complexity, the WASS Contract is to be solicited and awarded on a best value basis, such that the offeror with the most effective, innovative and efficient solution at the most competitive price will be selected to perform the work.

> **ANSWER:** To the extent the allegations in Paragraph 46 purport to characterize requirements in a best value procurement, they state conclusions of law to which no response is required.  To the extent a response is required, AAR denies those allegations.

47.     Because WASS is a highly complex, coordinated, and multinational and multi-disciplinary operation, the success of which depends on proposing the correct workforce/labor mix to maximize efficiency and effectiveness, the successful contractor will need a detailed understanding of the appropriate staffing mix, levels, and experience to meet and respond to the often rapid changes, escalation or de-escalation of mission parameters directed by the government, as well as where and how to recruit the right people with the right experience levels for the right positions and at the right pay to remain price competitive in the government's view.

> **ANSWER:** AAR denies the allegations in Paragraph 47.

48.     Through its performance of the Incumbent Contract, DI developed over its decades of experience the most efficient and effective combination of labor staffing, mix, qualifications, and cost structures and pricing (including an appropriate and competitive salary structure for operations personnel, and other employee data) to successfully meet the program requirements and operate the program.  This data, all of which is embodied in

the trade secrets, provide direct insight into the DI operations and pricing strategies that have made DI a successful incumbent contractor on the program for over 20 years, and thus have very significant economic and non-economic value to any competitor seeking to unseat DI from the contract.

**ANSWER:** AAR denies the allegations in Paragraph 48.

49.     DI's trade secrets are not generally known or readily ascertained using proper means by any person who could obtain economic value from them.  DI takes reasonable efforts to maintain the secrecy of the trade secrets, including by not intentionally releasing the information to competitors or third parties (except to business partners who have a need for access to such information and who have executed agreements to maintain its confidentiality) and requiring its employees to sign agreements confirming their obligation to maintain the confidentiality of such information.

**ANSWER:** AAR denies the allegations in Paragraph 49.

50.     DI is the sole owner of the trade secrets and was in possession of the trade secrets at all times material hereto, including at the time they were misappropriated by AAR.

**ANSWER:** AAR denies the allegations in Paragraph 50.

51.     The trade secrets were wrongfully obtained, through an organized campaign, by several members of AAR's senior leadership, who intentionally and tortiously targeted and hired DI employees with knowledge of the trade secrets in order to obtain that and other confidential DI information from them.

**ANSWER:** AAR denies the allegations in Paragraph 51.

52.     The former DI employees whom AAR tortiously poached in order to seek and obtain trade secrets all have confidentiality and non-disclosure agreements with DI and also fiduciary obligations that survive their separation from DI, such that, at all times material hereto, they remain subject to those restrictions, prohibiting the disclosure of the trade secrets and other DI proprietary or confidential information, knowledge, and data. These confidentiality and non-disclosure obligations prohibit the disclosure of the trade secrets wrongfully and tortiously sought and obtained by AAR from these former DI employees. *See, e.g.,* Ex. A hereto (Employee Confidentiality and Intellectual Property Agreement signed by James Christian Thomas on August 13, 2012).

**ANSWER:** AAR denies the allegations in Paragraph 52.

53.     AAR knew or had reason to know that the DI employees it approached and hired, and from whom it solicited the disclosure of DI trade secrets and other confidential DI information, had contractual and fiduciary obligations to DI that precluded them from making such unauthorized use or disclosure of DI information.

**ANSWER:** AAR denies the allegations in Paragraph 53.

54.     The confidential and proprietary information that AAR misappropriated included, but was not limited to, trade secrets that were in written form and contained confidential and proprietary information with DI logos or legends on them.  For example, members of AAR senior leadership were observed receiving and reviewing a large notebook of misappropriated, confidential, and proprietary information including DI trade secrets.  The large notebook included, among other things, confidential DI personnel lists

and salary information (which indicate how DI is presently fielding a successful labor force and its mix of properly qualified and experienced people at the right price), from former DI employee Thomas.  Thomas was obligated, under non-disclosure agreements, not to provide such information to any third party, and certainly not to a direct competitor such as AAR.

**ANSWER:** AAR denies the allegations in Paragraph 54.

55.     AAR also misappropriated confidential and proprietary information, including DI trade secrets, through verbal communication with former DI employees through coercion and cooperation.

**ANSWER:** AAR denies the allegations in Paragraph 55.

56.     Documents containing the wrongfully obtained DI confidential and proprietary information including DI's trade secrets were brought by AAR senior leadership to internal AAR meetings where they discussed the information itself, AAR's efforts to obtain that information, and AAR's proposal for the WASS Competition.

**ANSWER:** AAR denies the allegations in Paragraph 56.

57.     Documents containing the wrongfully obtained DI confidential and proprietary information, including DI trade secrets were also brought to, reviewed, and discussed during meetings of AAR's bid team for the WASS Competition.

**ANSWER:** AAR denies the allegations in Paragraph 57.

58.     The DI confidential and proprietary information, including DI trade secrets, wrongfully obtained by AAR provide a detailed roadmap of DI's specific historical costs, pricing strategies and technical approaches, including its staffing

approach, personnel lists and salary information (which again reveals DI's current, proprietary, and successful labor mix and the wages that DI is paying for those resources), which are the key discriminators and data needed to demonstrate to the State Department that an offeror for the State Department contract has a robust understanding of the contract requirements, and to propose a realistic and cost-effective solution that will be competitive.  None of this highly confidential and proprietary DI information, which DI developed and accumulated through its own efforts, experience, and expense, and represents the culmination of the millions of hours expended by DI over its more than two decades performing the Incumbent Contract, is publicly available – rather, it is closely guarded, confidential, and economically valuable data that was developed by DI through its own efforts.

**ANSWER:** AAR denies the allegations in Paragraph 58.

59.    AAR used, without DI's express or implied consent, DI's trade secrets and other confidential information to prepare its proposal for the WASS Competition, including, upon information and belief, in developing its proposal strategy, and identifying and mitigating risk areas in its proposal.

**ANSWER:** AAR denies the allegations in Paragraph 59.

60.    As a result of AAR's actions, DI was competitively harmed in the WASS Competition.  The confidential and proprietary information wrongfully obtained permitted AAR to improve its competitive position to the detriment of DI, including, upon information and belief, reducing its bid price or costs, and improving its technical proposal by using DI cost, manpower, technical and schedule information as a template to

structure and propose an efficient and effective workforce that will be able to successfully perform the government's requirements.

**ANSWER:** AAR denies the allegations in Paragraph 60.

61.     The members of AAR's senior leadership who obtained DI's trade secrets and other confidential information knew that their actions to obtain that information were illegal, tortious, and in violation of the former DI employees' strict confidentiality obligations to DI. Despite that actual knowledge, these members of AAR leadership intentionally, and in conscious disregard of DI's rights, pursued this course of conduct, knowing that it would seriously damage DI's business.

**ANSWER:** AAR denies the allegations in Paragraph 61.

62.     AAR actively and knowingly participated in such conduct and its officers, directors and/or managers knowingly condoned, ratified, and/or consented to such conduct.

**ANSWER:** AAR denies the allegations in Paragraph 62.

63.     In taking these actions, AAR acted with specific intent to harm DI and did in fact harm DI.

**ANSWER:** AAR denies the allegations in Paragraph 63.

**The State Department Inspector General is Investigating AAR's Conduct**

64.     On May 4, 2015, DI informed the State Department Contracting Officer and the State Department Inspector General that it had learned that AAR had obtained DI trade secrets relating to the WASS Competition, and asserted that AAR's misconduct was a violation of the Procurement Integrity Act, 41 U.S.C. §§ 2101-2107 ("PIA").

**ANSWER:** AAR lacks knowledge and information necessary to assess the truth or falsity of the allegations concerning DI's purported communications with the State Department and, therefore, denies those allegations.   AAR denies the remaining allegations in Paragraph 64, including any implication that it acted unlawfully or improperly in any way.

65.    The PIA prohibits an offeror from possessing and using another contractor's confidential and proprietary information in connection with a government procurement, and allows the government to impose sanctions and penalties on the offending offeror for a violation of the PIA.  The PIA does not provide for a private cause of action.

**ANSWER:** The allegations in Paragraph 65 state conclusions of law to which no response is required.   To the extent a response is required, AAR denies those allegations.

66.    The State Department Contracting Officer has referred the matter to the State Department Inspector General, which is investigating the matter.

**ANSWER:** AAR admits that the State Department Contracting Officer referred to the State Department Inspector General the allegations made by DI against AAR.  AAR states that the State Department Inspector General investigated those allegations and closed its investigation without recommending or taking any action against AAR. AAR denies the remaining allegations in Paragraph 66.

67.    On May 7, 2015, DI filed a second protest with GAO alleging PIA and unfair competition violations by AAR impacting the WASS Competition but, with GAO

noting that the matter has been referred to the Inspector General, this protest was dismissed as premature pending the results of that investigation.

**ANSWER:** AAR admits that on May 7, 2015, DI filed a second protest with the GAO and that this protest was dismissed.  AAR states that DI's protest and the GAO's dismissal order are the best evidence of their contents.  AAR denies all of the remaining allegations in Paragraph 67.

<u>**AAR Has Admitted It Obtained Other DI Trade Secrets Through Other Improper Channels**</u>

68.    Separate and apart from Witness A's disclosure of AAR's misappropriation of DI's confidential information from former DI employees, but within the same week in May 2015, AAR admitted to the State Department that it was in possession of another highly proprietary DI document, known as a PMA.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR denies the allegations in Paragraph 68.

69.    The PMA, a detailed spreadsheet that contains approximately twenty discrete tabs, and collectively consists of nearly 10,000 rows of confidential data, contains trade secrets about DI's quarterly and prior performance on the Incumbent Contract, including staffing, labor, costs, profit margins, overhead, revenue and other financial data, and provides direct insight into DI's operations and pricing strategies on

the Incumbent Contract. The PMA provides detailed information about DI's current operational, staffing, and pricing approaches.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR states that it lacks knowledge sufficient to assess the truth or falsity of the allegations in Paragraph 69 and, accordingly, denies the allegations in Paragraph 69 and specifically denies that it has knowledge of the contents of the PMA.

70.     For example, the PMA contains detailed income statements showing DI's direct and indirect costs, gross profit from operations, general and administrative expenses, and unallowable costs on the Incumbent Contract. Moreover, because the PMA also includes detailed data about historical performance periods on the Incumbent Contract, this backward- looking information shows DI's performance trends over time, which gives AAR the advantage of seeing the overall performance issues that DI has encountered over time. This allows AAR to structure a comprehensive and flexible operational approach that it would not otherwise be able to prepare.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this

paragraph is required.  To the extent a response is required, AAR states that it lacks knowledge sufficient to assess the truth or falsity of the allegations in Paragraph 70 and, accordingly, denies the allegations in Paragraph 70 and specifically denies that it has knowledge of the contents of the PMA.

71.    In total, the PMA contains thousands of lines of confidential financial data about DI's Incumbent Contract, and spreadsheets that compute key financial metrics regarding the Incumbent Contract, including DI's revenues, costs, fees, and profit margins. DI takes all reasonable efforts to maintain the secrecy of the PMAs, including the one that AAR obtained and apparently is still in possession of, by not intentionally releasing it to competitors or third parties and requiring its employees and agents to sign agreements confirming their obligation to maintain the confidentiality of such information.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR states that it lacks knowledge sufficient to assess the truth or falsity of the allegations in Paragraph 71 and, accordingly, denies the allegations in Paragraph 71 and specifically denies that it has knowledge of the contents of the PMA.

## AAR's Misleading Disclosure to the State Department

72.    AAR obtained the PMA on April 21, 2015.  On that day, Michael Peterson, a part-time employee of AAR who is consulting for AAR on the WASS Competition, received

an email and attachment (which was the PMA) from Tom Cline, President of Eagle Aviation

Services & Technology ("EAST").   See Declaration of Michael Peterson ("Peterson Decl."),

attached as Exhibit 2 to AAR's Response in Opposition to AAR's Motion for Preliminary

Injunction, Doc No. 43 at ¶ 3.

> **<u>ANSWER:</u>** AAR states that, in accordance with opinions issued in this matter by
>
> the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit,
>
> DI's allegations concerning the PMA do not state a claim upon which relief can be
>
> granted and are thus no longer properly part of DI's claims.   No response to this
>
> paragraph is required.   To the extent a response is required, AAR respectfully refers
>
> the Court to the Declaration of Michael Peterson for its contents.   AAR denies the
>
> remaining allegations in Paragraph 72.

73.     EAST is a current DI subcontractor and a potential subcontractor to AAR if

AAR is awarded the WASS Contract.   See Exhibit 1 to the Declaration of Joel Singer

(Exhibit 3 in Doc No. 43) ("received an email earlier this week from the owner of a company

that could possibly become a subcontractor to us if we are awarded the next INL contract.").

> **<u>ANSWER:</u>** AAR states that, in accordance with opinions issued in this matter by
>
> the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit,
>
> DI's allegations concerning the PMA do not state a claim upon which relief can be
>
> granted and are thus no longer properly part of DI's claims.   No response to this
>
> paragraph is required.   To the extent a response is required, AAR respectfully refers
>
> the Court to the Declaration of Joel Singer for its contents.   AAR lacks knowledge
>
> sufficient to assess the truth or falsity of the allegations concerning EAST's status as

a subcontractor to DI and, accordingly, denies those allegations. AAR denies the remaining allegations in Paragraph 73.

74.     EAST has confidentiality requirements pursuant to its existing DI subcontract. EAST's provision of the email and attachment to AAR is a violation of EAST's obligations under its subcontract with DI.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR is without knowledge and information sufficient to assess the truth or falsity of the allegations in Paragraph 74 and, accordingly, denies the allegations in Paragraph 74.

75.     Peterson stated that he reviewed the attachment, noticed it had DI information related to the INL contract, and had concerns it might contain sensitive information. Peterson Decl. ¶ 3.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR respectfully refers the Court to the Declaration of Michael Peterson for its contents. AAR denies the

remaining allegations in Paragraph 75 and specifically denies that it has knowledge of the contents of the PMA.

76.     Nevertheless, Peterson attested that, on April 21, 2015, he decided he should bring the email and PMA attachment to someone's attention at AAR and he forwarded the email and attachment to his AAR email account.  Peterson Decl. ¶ 4.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers the Court to the Declaration of Michael Peterson for its contents.  AAR denies the remaining allegations in Paragraph 76.

77.     From April 21-May 1, 2015, despite his professed concern that the email and PMA attachment contained DI sensitive information, Peterson did not quarantine, firewall, or delete the email and PMA attachment.  Peterson Decl. ¶ 4.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers the Court to the Declaration of Michael Peterson for its contents.  AAR denies the

remaining allegations in Paragraph 77 and specifically denies that it has knowledge of the contents of the PMA.

78.     Peterson stated that on May 1, 2015 at approximately 8:10 am, he showed the email and attachment to Rich Walberg, AAR's Director of Business Development who had been involved in AAR's INL proposal.  Peterson Decl. ¶ 5.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers the Court to the Declaration of Michael Peterson for its contents.  AAR denies the remaining allegations in Paragraph 78.

79.     At 6:01 pm on May 1, 2015, AAR sent a misleading email to the State Department admitting possession of an email with an attached spreadsheet referencing the INL Program.  See Exhibit 1 to the Declaration of Joel Singer (Exhibit 3 in Doc No. 43).

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers

the Court to the Declaration of Joel Singer for its contents (Doc. 43-3). AAR denies the remaining allegations in Paragraph 79.

80.     AAR's disclosure to the State Department was misleading and incomplete in many ways.[2] In relevant part, the disclosure email to the State Department stated: "We immediately took steps to ensure that neither the recipient of this email nor anyone else at AAR will review this document." Exhibit 1 to the Declaration of Joel Singer.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR respectfully refers the Court to the Declarations of Joel Singer and Michael Peterson for their respective contents (Docs. 43-3 and 43-2). AAR denies the remaining allegations in Paragraph 80 including those in footnote 2 appended thereto.

81.     The disclosure implied that AAR immediately quarantined DI's confidential and proprietary PMA document upon Peterson's receipt of the document and has permanently destroyed the document when, in fact, Peterson, by his own admission, left the data unguarded and thus fully accessible on AAR's computer systems for almost two

---

[2] AAR misleadingly reported to the State Department that it had received the email and PMA attachment "earlier in the week" when in fact its consultant, Peterson, had received them -- and forwarded them to his AAR account – ten days earlier, on April 21, 2015. Peterson Decl. ¶ 3, Exhibit 1 to the Declaration of Joel Singer.

weeks and AAR has provided no statement that the PMA has been permanently deleted from AAR's corporate servers or Peterson's home computer.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.   To the extent a response is required, AAR denies the allegations in Paragraph 81.

82.    The disclosure stated that no one reviewed the confidential PMA data when, in fact, Peterson (an AAR employee and its consultant on the WASS Competition) and Walberg (an AAR executive responsible for AAR's proposal efforts on the WASS Competition) had both reviewed the document (neither of whom have been firewalled from the WASS Competition), thus providing no assurances that AAR will not use or be able to use DI's PMA information to prepare its best and final proposal.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.   To the extent a response is required, AAR denies the allegations in Paragraph 82 and specifically denies that is has knowledge of the contents of the PMA.

83.     The disclosure implied that the PMA was the only confidential DI document wrongly in AAR's possession when, in fact, AAR had misappropriated many other DI trade secrets regarding the WASS program from former DI employees. AAR's disclosure appears to be designed to leave the government with the incorrect impression that the only problematic document in AAR's possession was the PMA.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph as it pertains to the PMA is required.  To the extent a response is required, AAR denies the allegations in Paragraph 83 concerning the PMA.  AAR additionally denies the remaining allegations in Paragraph 83.

84.     As noted, AAR has provided no representations that the PMA has been permanently deleted from AAR's corporate servers or from Peterson's home or personal computer.  In this regard, AAR claims that it retained a third party vendor to secure and image Peterson's home computer (Declaration of Jason Dieterle ("Dieterle Decl.") ¶ 4 (Exhibit 4 in Doc No. 43).  According to AAR, however, the vendor then apparently left the image with Peterson (Peterson Decl. ¶ 8 ("I deleted the Cline email and its attachment permanently from both my computer and the image created by Dieterle."), Dieterle ¶ 7 ("I do not now possess the email and its attachment or any copies thereof").  It is not credible that an independent IT vendor would make an image of an individual's computer, but then leave the image with that individual.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers the Court to the Declaration of Jason Dieterle for its contents (Doc. 43-4).  AAR denies the remaining allegations in Paragraph 84.

85.    AAR also stated that Peterson then, on his own initiative, deleted the PMA and its accompanying email from the image that the third party vendor had prepared. Dieterle Decl. ¶ 4, Peterson Decl. ¶ 8.  It is not credible that Peterson would be able to permanently delete selected files from the image of his computer.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR respectfully refers Court to the Declarations of Michael Peterson and James Dieterle for their respective contents (Docs. 43-2 and 43-4) and denies the remaining allegations in Paragraph 85.

86.    AAR has provided no information as to the current whereabouts of the image created of Peterson's home computer that contained DI's trade secrets.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR denies the allegations in Paragraph 86.

87.     On May 4, 2015, the same day that DI informed the State Department of AAR's misappropriation of other DI trade secrets as disclosed by Witness A, AAR provided a copy of the Cline email and attachment (PMA) to the State Department. Dieterle Decl. ¶ 6.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph is required. To the extent a response is required, AAR respectfully refers the Court to the Declaration of Jason Deiterle for its contents (Doc. 43-4) and denies the remaining allegations in Paragraph 87.

88.     The PMA, like the other trade secrets that AAR wrongfully obtained and retained, has significant, independent economic value because it is maintained confidentially, not generally known by those who can obtain economic value from its disclosure, and cannot be ascertained through obvious means by those who can obtain value from it.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph is required.  To the extent a response is required, AAR states that it lacks knowledge sufficient to assess the truth or falsity of the allegations in Paragraph 88 concerning the PMA and, accordingly, denies those allegations.  AAR denies the remaining allegations in Paragraph 88.

89.    Despite acknowledging to the State Department that it is in possession of DI trade secrets, AAR has neither (a) returned the DI trade secrets in its possession; (b) disclosed the extent of its misappropriation and misuse of DI trade secrets; nor (c) represented that it did not use any DI trade secrets in preparation of its bid for the WASS Contract.

**ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims.  No response to this paragraph as it pertains to the PMA is required.  To the extent a response is required, AAR denies the allegations in Paragraph 89 concerning the PMA.  AAR additionally denies the remaining allegations in Paragraph 89.

90.    AAR's possession of the PMA and other DI confidential and proprietary information represents significant, ongoing harm to DI because AAR can use that

information, to structure its upcoming revised proposal to the State Department on the re-compete to DI's material detriment.

> **ANSWER:** AAR states that, in accordance with opinions issued in this matter by the District Court and a panel of the U.S. Court of Appeals for the Eleventh Circuit, DI's allegations concerning the PMA do not state a claim upon which relief can be granted and are thus no longer properly part of DI's claims. No response to this paragraph as it pertains to the PMA is required. To the extent a response is required, AAR denies the allegations in Paragraph 90 concerning the PMA. AAR additionally denies the remaining allegations in Paragraph 90.

### Damages

91.    DI has sustained significant damages, yet to be completely identified and quantified, that are the direct and proximate result of the wrongful actions of AAR which are described herein.

> **ANSWER:** AAR denies the allegations in Paragraph 91.

92.    Such damages are ongoing and include, but are not limited to, the following:

a.    Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, to DI's business and operations resulting from AAR's theft, conversion and wrongful use of the trade secrets and other proprietary information, which affected DI's ability to fairly compete in the WASS Competition;

> **ANSWER:** AAR denies the allegations in Paragraph 92(a).

b.    Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, to DI's business and operations resulting from the

impairment of its investment in the WASS program and its bid proposal for the WASS Competition, which investment was adversely affected as a direct and proximate result of the wrongful actions of AAR; and,

**ANSWER:** AAR denies the allegations in Paragraph 92(b).

c.      Significant damages, including direct, indirect, collateral, punitive, consequential and incidental damages, in regard to AAR's obtaining DI's trade secrets and other confidential information, which has significant economic value, thereby depriving DI of exclusive use of this information.

**ANSWER:** AAR denies the allegations in Paragraph 92(c).

93.      Such damages significantly exceed $75,000.

**ANSWER:** AAR denies the allegations in Paragraph 93.

94.      DI is, and continues to be, irreparably harmed by AAR's unlawful possession and use of DI's trade secrets and other confidential information, including in connection with the preparation and submission of its proposal for the WASS Competition, for which DI has been reinstated, is in discussions with the government on its proposal, and will be submitting a revised best and final proposal to the government at the conclusion of the discussions process.

**ANSWER:** AAR denies the allegations in Paragraph 94.

95.      DI is, and continues to be, irreparably harmed by AAR's continued unlawful possession of and ability to use DI's trade secrets and other confidential information in connection with future competitions for federal government contracts in which DI and AAR will compete.

**ANSWER:** AAR denies the allegations in Paragraph 95.

96.     Unless AAR is ordered to return the proprietary information and prohibited from making any further use of the information, AAR will continue to knowingly, dishonestly and intentionally capitalize on DI's proprietary information to which it has no rightful claim or license.

**ANSWER:** AAR denies the allegations in Paragraph 96.

## COUNT I

### (Violation of Florida Uniform Trade Secrets Act)

97.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

98.     This is a claim against AAR for its violation of the Florida Uniform Trade Secrets Act, ("FUTSA"), Fla. Stat. § 688.001, et seq., (2005).

**ANSWER:** AAR denies the allegations in Paragraph 98.

99.     At all times material hereto, all right, title and interest in the trade secrets misappropriated by AAR resided with, and continues to reside with, DI, and DI is the sole owner of the trade secrets.

**ANSWER:** AAR denies the allegations in Paragraph 99.

100.     AAR knowingly, dishonestly, willfully, maliciously, wrongfully, and intentionally obtained DI's Trade secrets, and knowingly, dishonestly, willfully, maliciously, wrongfully and intentionally used and continues to use and benefit from, DI's trade secrets

for its own benefit, without DI's express or implied consent.  Such use and continued use constitutes misappropriation of DI's confidential, proprietary and trade secret information in violation of FUTSA.

**ANSWER:** AAR denies the allegations in Paragraph 100.

101.    DI has taken reasonable steps to protect its trade secrets by instituting internal company policies and procedures regulating access to, designation of, and dissemination of its proprietary and trade secret information, and by other means, including by requiring its employees and agents to sign confidentiality and non-disclosure agreements which prohibit the disclosure of proprietary and trade secret information without DI's express written consent, such trade secrets deriving independent economic value from not being generally known to the public.

**ANSWER:** AAR denies the allegations in Paragraph 101.

102.    At all times material hereto, DI has had the continued right to exclusive ownership, enjoyment, and use of its proprietary and trade secret information, without interference from AAR.

**ANSWER:** AAR denies the allegations in Paragraph 102.

103.    AAR obtained the trade secrets and knew, or had reason to know, that it had done so by improper means.  At all times material hereto, AAR knew that such information was trade secret information, belonged exclusively to DI, was highly sensitive, confidential and proprietary, and that the sources of the information, both DI's subcontractor and DI's former employees, had contractual duties, fiduciary duties and duties of loyalty that

prohibited them from disclosing this information.  AAR deliberately induced at least DI's former employees to breach their duties to DI.

**ANSWER:** AAR denies the allegations in Paragraph 103.

104.    Without DI's express or implied consent, AAR disclosed and/or used DI's trade secrets.

**ANSWER:** AAR denies the allegations in Paragraph 104.

105.    AAR's misappropriation of DI's trade secrets was willful and malicious.

**ANSWER:** AAR denies the allegations in Paragraph 105.

106.    As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 92 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

**ANSWER:** AAR denies the allegations in Paragraph 106.

## COUNT II

### (Conversion)

107.    DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

108.    At all times material hereto, all right, title, and interest in the confidential and proprietary DI information that AAR misappropriated resided, and continues to reside, with DI.

**ANSWER:** AAR denies the allegations in Paragraph 108.

109.    DI was in possession of, and had the right to sole possession of, its proprietary and trade secret information at the time it was misappropriated by AAR.

**ANSWER:** AAR denies the allegations in Paragraph 109.

110.    AAR knowingly, intentionally and wrongfully procured, obtained, and exercised authority and dominion over – and has knowingly, intentionally, wrongfully retained, converted to its own use, capitalized on the value of, and deprived DI of the benefits of sole possession of, DI's confidential and proprietary information, without DI's consent or authorization, and in a manner contrary to DI's rights and inconsistent with DI's ownership interests.

**ANSWER:** AAR denies the allegations in Paragraph 110.

111.    At all times material hereto, AAR knew that the information it misappropriated from DI was confidential and/or proprietary and/or a trade secret and belonged exclusively to DI.

**ANSWER:** AAR denies the allegations in Paragraph 111.

112.    AAR's actions constitute a knowing, unlawful, and intentional conversion of DI's confidential and proprietary information for AAR's economic benefit, and to the economic detriment of DI.

**ANSWER:** AAR denies the allegations in Paragraph 112.

113.    On May 4, 2015, DI put AAR's corporate parent, AAR CORP., on notice of AAR's wrongful conduct and demanded that AAR CORP. address and rectify that conduct. AAR CORP. has failed to do so.

**ANSWER:** AAR denies the allegations in Paragraph 113.

114.     As a direct and proximate result of AAR's conversion of DI's confidential and proprietary information, as described herein, DI has sustained actual damages as described in paragraph 92.

**ANSWER:** AAR denies the allegations in Paragraph 114.

<u>**COUNT III**</u>

**(Tortious Interference with Contractual Relations)**

115.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

116.     Valid and enforceable confidentiality and non-disclosure agreements existed between DI and its employees, pursuant to which its employees are obligated not to disclose any confidential or proprietary or trade secret information belonging to DI even after the termination of their employment with DI.

**ANSWER:** AAR denies the allegations in Paragraph 116.

117.     AAR knew or should have known of the existence of the contracts between DI and its employees and the obligation of DI's employees not to disclose confidential or proprietary or trade secret information belonging to DI.

**ANSWER:** AAR denies the allegations in Paragraph 117.

118.     AAR intentionally and improperly interfered with – and procured and induced the breach of – these contractual requirements between DI and its employees.

**ANSWER:** AAR denies the allegations in Paragraph 118.

119.    AAR had no justification, privilege or right to interfere with, or procure or induce the breach of, these contracts between DI and its employees.

**ANSWER:** AAR denies the allegations in Paragraph 119.

120.    As a direct and proximate result of AAR's tortious interference with DI's contractual relations as described herein, DI has sustained actual damages as described in paragraph 92.

**ANSWER:** AAR denies the allegations in Paragraph 120.

## COUNT IV

### (Tortious Interference with Existing and Prospective Business Relations)

121.    DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

122.    An ongoing business relationship exists between DI and State regarding the WASS program, pursuant to the Incumbent Contract.

**ANSWER:** AAR denies the allegations contained in Paragraph 122.

123.    DI has existing and prospective contractual rights pursuant to that business relationship.

**ANSWER:** AAR denies the allegations in Paragraph 123.

124.    DI sought to continue its business relationship with State through the WASS Competition.

**ANSWER:** AAR denies the allegations in Paragraph 124.

-49-

125.    AAR had knowledge of DI's existing and prospective business relationship with State.

**ANSWER:** AAR denies the allegations in Paragraph 125.

126.    AAR intentionally and improperly interfered with DI's existing and prospective business relationship with State, including by using DI's confidential and proprietary information to develop its WASS proposal strategy, identify and mitigate risk areas in its proposal, and obtain an unfair competitive advantage over DI for the WASS Contract.

**ANSWER:** AAR denies the allegations in Paragraph 126.

127.    Were it not for AAR's wrongful conduct, DI would have been able to compete fairly with AAR for the WASS Contract, and AAR would have received lower evaluation scores by State for the WASS Contract.

**ANSWER:** AAR denies the allegations in Paragraph 127.

128.    As a result of AAR's wrongful conduct, DI may be prevented from continuing its existing business relationship with State and from entering into a prospective business relationship with State.

**ANSWER:** AAR denies the allegations in Paragraph 128.

129.    AAR had no justification, privilege or right to interfere with the existing and prospective business relationship between DI and State through the misappropriation of DI's confidential and proprietary information.

**ANSWER:** AAR denies the allegations in Paragraph 129.

130.     As a direct and proximate result of AAR's tortious interference with DI's existing and prospective business relationship, as described herein, DI has sustained actual damages as described in paragraph 92.

**ANSWER:** AAR denies the allegations in Paragraph 130.

## COUNT V

### (Aiding and Abetting Breach of Fiduciary Duty)

131.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

132.     The former DI employees who had access to DI's confidential and proprietary information owed fiduciary and contractual duties to DI.

**ANSWER:** AAR denies the allegations in Paragraph 132.

133.     These fiduciary duties precluded the DI employees from using or disclosing the confidential and proprietary DI information to which they had access while employed by DI for any purpose other than in connection with their work for DI.  These fiduciary duties survived termination of their employment.

**ANSWER:** AAR denies the allegations in Paragraph 133.

134.     The former DI employees breached their fiduciary duties to DI by disclosing DI's confidential and proprietary information to AAR.

**ANSWER:** AAR denies the allegations in Paragraph 134.

135.    AAR knew of the existence of the fiduciary duties and participated in the breach of those duties by the DI employees.

**ANSWER:** AAR denies the allegations in Paragraph 135.

136.    AAR induced, encouraged and provided substantial assistance to this breach of fiduciary duty, including by hiring the DI employees and then pressuring them to disclose DI's confidential and proprietary information to AAR.

**ANSWER:** AAR denies the allegations in Paragraph 136.

137.    AAR's substantial inducement and encouragement of, and assistance in, this breach of fiduciary duty was done with a deliberate and conscious intent by AAR, and/or with recklessness by AAR and in violation of AAR's duty to disclose the breach.

**ANSWER:** AAR denies the allegations in Paragraph 137.

138.    As a direct and proximate result of AAR's aiding and abetting the former DI employees' breach of fiduciary duty as described herein, DI has sustained actual damages as described in paragraph 92.

**ANSWER:** AAR denies the allegations in Paragraph 138.

## COUNT VI

### (Unjust Enrichment)

139.    DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

140.     As described herein, AAR unlawfully, intentionally, and knowingly solicited, obtained and used DI's highly sensitive, proprietary and trade secret information in violation of applicable law.

**ANSWER:** AAR denies the allegations in Paragraph 140.

141.     At all times material hereto, AAR knew that such benefits were conferred upon it, and voluntarily accepted and retained such benefits, knowing that the confidential and proprietary information had been misappropriated from DI.

**ANSWER:** AAR denies the allegations in Paragraph 141.

142.     At all times material hereto, AAR would be unlawfully and unjustly enriched if it were allowed to enjoy the benefits derived from such proprietary and trade secret information without being required to compensate the party responsible for conferring those benefits.

**ANSWER:** AAR denies the allegations in Paragraph 142.

143.     The fair value of the benefits conferred on and obtained by AAR is the value it has derived from obtaining and using the proprietary and trade secret information, and from its ongoing use of such information, including in the preparation and submission of its proposal for the WASS Competition and for other business purposes.  Accordingly, AAR has been unjustly enriched in an amount to be determined at trial, and DI is entitled to be paid that same amount.

**ANSWER:** AAR denies the allegations in Paragraph 143.

144.     As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 92 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

**ANSWER:** AAR denies the allegations in Paragraph 144.

## COUNT VII

### (Conspiracy)

145.     DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

146.     AAR conspired with others known and unknown to DI, including the former DI employees from whom AAR obtained DI's confidential and proprietary information, to knowingly, intentionally, and unlawfully solicit, obtain, and use DI confidential and proprietary information in connection with the preparation and submission of its proposal for the WASS Competition.

**ANSWER:** AAR denies the allegations in Paragraph 146.

147.     As alleged in this Complaint, the acts which AAR conspired to do were unlawful.

**ANSWER:** AAR denies the allegations in Paragraph 147.

148.     AAR and the individuals and entities with which AAR conspired took overt acts in pursuance of the conspiracy, including by soliciting and obtaining DI's confidential

and proprietary information and using that information in the preparation and submission of its proposal for the WASS Competition.

**ANSWER:** AAR denies the allegations in Paragraph 148.

149.    As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 92 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

**ANSWER:** AAR denies the allegations in Paragraph 149.

## COUNT VIII

### (Violation of Florida's Unfair and Deceptive Trade Practices Act)

150.    DI realleges and incorporates herein by reference the allegations in numbered paragraphs 1 through 96 as if fully set forth herein.

**ANSWER:** AAR repeats and restates each and every response to the allegations set forth in paragraphs 1 through 96 as if fully set forth herein.

151.    AAR engaged in tortious misconduct including specifically targeting and hiring experienced DI employees who worked on the Incumbent Contract and had access to confidential and proprietary information including DI Trade secrets regarding the WASS program.

**ANSWER:** AAR denies the allegations in Paragraph 151.

152.    AAR engaged in tortious misconduct including aiding and abetting the breach of the fiduciary duty of current and former DI employees.

**ANSWER:** AAR denies the allegations in Paragraph 152.

153.    AAR knowingly, dishonestly, wrongfully and intentionally obtained DI's confidential and proprietary information, and wrongfully used, and continues to use, that information for its own benefit.

**ANSWER:** AAR denies the allegations in Paragraph 153.

154.    AAR's use and continued use of DI's confidential and proprietary information constitutes theft and misappropriation under Florida law, which AAR knowingly and willingly violated.

**ANSWER:** AAR denies the allegations in Paragraph 154.

155.    AAR knowingly, dishonestly, wrongfully and intentionally obtained DI's confidential and proprietary information, and wrongfully used, and continues to use and benefit from, that information, in breach of its duty not to obtain or use such proprietary and trade secret information.

**ANSWER:** AAR denies the allegations in Paragraph 155.

156.    AAR knowingly, dishonestly, wrongfully, and intentionally obtained DI's confidential and proprietary information, and wrongfully used, and continues to use and benefit from, that information, knowing that the sources of the information, including the former DI employees, had contractual duties, fiduciary duties, and duties of loyalty that prohibited them from disclosing this information.  Nevertheless, AAR induced them to provide such information in breach of those duties.  All of the foregoing acts constitute violations of applicable Florida law, which AAR knowingly and willingly violated.

**ANSWER:** AAR denies the allegations in Paragraph 156.

157.    AAR's wrongful actions described throughout this Complaint, and in paragraphs 122 through 126 in particular, constitute unconscionable, unethical, unfair and deceptive trade practices in violation of Florida's Unfair and Deceptive Trade Practices Act, ("FUDTPA"), Fla. Stat. § 501.201, *et seq.*, (1988).

**ANSWER:** AAR denies the allegations in Paragraph 157.

158.    AAR knew, or reasonably should have known, that its actions were unconscionable, unethical, unfair and deceptive methods of competition and of conducting business and that such actions were wrongful and violated applicable law.

**ANSWER:** AAR denies the allegations in Paragraph 158.

159.    As a direct and proximate result of AAR's wrongful actions described herein, DI has sustained actual damages as described in paragraph 92 herein, and will continue to accrue and sustain such damage in the future on an ongoing and continuing basis.

**ANSWER**: AAR denies the allegations in this Paragraph 159.

**PRAYER FOR RELIEF**

160.    DI respectfully requests that this Court enter judgment in favor of DI and against AAR and grant DI:

A.    Actual and compensatory damages, including lost profits, in amounts to be proven at trial;

B.    Permanent injunctive relief, including an order requiring AAR to return and not to use DI's confidential and proprietary information that AAR misappropriated, and to prevent the continued inducement of current or former DI employees to disclose DI's confidential and proprietary

information to AAR as well as any other affirmative acts that may be necessary to protect DI's confidential and proprietary information;

C. Enhanced damages pursuant to FUTSA, Fla. Stat. §§ 688.001-009, specifically § 688.004(2);

D. Punitive damages;

E. Attorneys' fees, including attorneys' fees recoverable under FUDTPA and FUTSA, costs, and pre-judgment and post-judgment interest; and,

F. Such other and further relief as the Court deems just and proper.

**ANSWER:** AAR denies the allegations in this Paragraph 160 and denies that DI is entitled to any relief in this action.

\* \* \* \*

AAR hereby denies each and every allegation in the First Amended Complaint that is not specifically admitted above. AAR additionally denies any allegations contained in the section headings within the First Amended Complaint.

## DEFENSES, INCLUDING AFFIRMATIVE DEFENSES, TO THE FIRST AMENDED COMPLAINT

By way of further answer and defense to the First Amended Complaint, AAR states that DI's claims are barred, in whole or in part, by the Affirmative Defenses set forth below. AAR reserves the right to supplement and/or amend these Affirmative Defenses and supporting factual allegations as additional discovery and/or information comes to light. The facts alleged below may be common to two or more affirmative defenses but are alleged only once to avoid repetition and for the convenience of the Court and the parties.

DI brought this action for the sole purpose of attempting to influence the outcome of the award of the contract for the WASS program.  As the Court has already noted, "[DI] is using this litigation as some sort of leverage or tool to enhance its position before the State Department in connection with this bid."  (Doc. 54 at 44:11-14).  And DI did so only after sitting on its hands for months after it claims the operative facts occurred, delaying until what it apparently believed was an opportune time in the procurement process to launch this litigation.  Further, DI has used this litigation and its protests in the procurement process to attempt to delay the State Department's award of the contract in the WASS program, as well as AAR's performance of the WASS contract which the State Department awarded to AAR in September 2016, so that DI can obtain lucrative bridge contracts to essentially continue its performance of the work it was performing under the Incumbent Contract.

Moreover, even if there were any merit to DI's allegations against AAR – which there is not – DI's lack of success in the WASS competition was not due in any way to any actions of AAR.  Rather, DI's failure to succeed in the WASS competition was due to deficiencies in DI's own proposal.

<u>FIRST AFFIRMATIVE DEFENSE</u>

The First Amended Complaint fails to state a claim or cause of action upon which relief may be granted.

<u>SECOND AFFIRMATIVE DEFENSE</u>

Counts II through VIII of the First Amended Complaint are preempted by the Florida Uniform Trade Secrets Act, FLA. STAT. § 688.001 *et seq.*.

## THIRD AFFIRMATIVE DEFENSE

Assuming, *arguendo*, that any of AAR's actions affected DI's contractual or proprietary rights, such actions were privileged and/or justified.

## FOURTH AFFIRMATIVE DEFENSE

DI's claims are untimely and are barred by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

DI's claims of wrongdoing have been waived by DI, in whole or in part, and are therefore barred.

## SIXTH AFFIRMATIVE DEFENSE

DI's claims are subject to offset to the extent DI has received or will receive valuable consideration for services on the WASS program after the time AAR should have commenced performance but for DI's raising of claims with the State Department and/or DI's other actions related to protests and litigation relating to the WASS procurement.

## SEVENTH AFFIRMATIVE DEFENSE

DI's claims are barred by the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

DI has failed to mitigate, prevent, or otherwise limit its purported damages.

## NINTH AFFIRMATIVE DEFENSE

DI is not entitled to any recovery of punitive damages.

## TENTH AFFIRMATIVE DEFENSE

DI is not entitled to any recovery of attorneys' fees or costs under applicable law.

## ELEVENTH AFFIRMATIVE DEFENSE

DI is not entitled to any recovery of lost profits, enhanced damages, or pre- and/or post-judgment interest under applicable law.

## TWELFTH AFFIRMATIVE DEFENSE

DI's claim of conversion is barred by DI's failure to make a demand as required by law.

## THIRTEENTH AFFIRMATIVE DEFENSE

DI's claim of tortious interference with contractual relations is barred because the contracts in regard to which DI claims interference are illegal and/or void.

## FOURTEENTH AFFIRMATIVE DEFENSE

DI's claim of tortious interference with existing and prospective business relations is barred because the relations in regard to which DI claims interference were terminable at the will or option of the State Department.

## FIFTEENTH AFFIRMATIVE DEFENSE

DI's claim of unjust enrichment is barred because the alleged benefit AAR received was not derived at DI's expense or effort, and because any alleged benefit AAR received was received in good faith.

## SIXTEENTH AFFIRMATIVE DEFENSE

DI's claim under the Florida Deceptive and Unfair Trade Practices Act is barred because AAR's alleged acts were permitted by law.

SEVENTEENTH AFFIRMATIVE DEFENSE

Any recovery on DI's First Amended Complaint, or any purported cause of action alleged therein, is barred in whole or in part by DI's own contributory and/or comparative fault.

EIGHTEENTH AFFIRMATIVE DEFENSE

DI's claims fail to the extent they are contrary to, preempted by, or in violation of any applicable federal or state constitutional provision, law, rule or regulation.

NINETEENTH AFFIRMATIVE DEFENSE

DI's claims are barred to the extent they are untimely under applicable statutes of limitation.

*      *      *      *

AAR reserves the right to assert additional defenses that become known to it during the course of this action.

**AAR's PRAYER FOR RELIEF**

AAR denies that DI is entitled to any of the relief it seeks.  WHEREFORE, AAR respectfully requests that this Court:

(a)      Enter judgment in favor of AAR and against DI;

(b)      Dismiss DI's First Amended Complaint and each cause of action with prejudice;

(c)      Award AAR attorneys' fees and costs of this action; and

(d)      Grant such other and further relief as this Court deems just and proper.

Dated: February 14, 2017

Respectfully submitted,

/s/ Thomas A. Zehnder
Thomas A. Zehnder
Florida Bar No.: 0063274
Frederick S. Wermuth
Florida Bar No.: 0184111
Taylor F. Ford
Florida Bar No.: 0041008
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
tzehnder@kbzwlaw.com
fwermuth@kbzwlaw.com
tford@kbzwlaw.com

Jonathan Cohn[*]
Joel Singer[*]
Robert J. Conlan[*]
Justin A. Benson[*]
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
rconlan@sidley.com
joelsinger@sidley.com
jfcohn@sidley.com
jbenson@sidley.com

Eric G. Hoffman[*]
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
eric.hoffman@sidley.com

*(Admitted PHV)*

*Counsel for Defendant AAR Airlift Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on February 14, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Thomas A. Zehnder
Thomas A. Zehnder
Florida Bar No.: 0063274

*Counsel for Defendant AAR Airlift Group, Inc.*